# Steve Massey
# Deposition Transcript
# Excerpts and Exhibits

STEPHEN MASSEY　　　CONFIDENTIAL　　　October 3, 2005
ATTORNEY'S EYES ONLY

Page 74

1 there's some way you can answer the question
2 without revealing any communications, for example,
3 if some discussions were had during a communication
4 with in-house counsel or outside counsel, I would
5 consider that to be privileged. If you had a
6 communication with some employee of Vision outside
7 of any communication with an attorney, to the
8 extent you weren't discussing what the attorney
9 said, you can answer the question to that extent.
10 So just to clarify.
11 　　　THE WITNESS: The decision was made
12 by several executives on advice from the attorney.
13 　Q. (BY MR. BERNDT) And who were those
14 executives?
15 　A. Nicolaas Vlok, Alan Arnold, Tim Keithahn
16 and myself.
17 　Q. And when did you make the decision to
18 impose the Vision-imposed restrictions?
19 　A. I don't know the exact date but it was
20 very quickly after the negotiations for an
21 agreement broke down. Actually, a little bit more
22 specific, it was right after the TRO was lifted.
23 　Q. In the days after the TRO was lifted?
24 　A. Yes.
25 　Q. The day after the TRO was lifted?

Page 75

1 　A. I don't know that it was that quickly. It
2 was a number of days, but it wasn't very long.
3 　Q. Who has the authority to lift the
4 Vision-imposed restrictions on Mr. Robinson's
5 activities?
6 　　　MR. LANCILOTI: Object to the form of
7 the question as to speculation. You can answer
8 over that.
9 　　　THE WITNESS: Nicolaas Vlok or Alan
10 Arnold. I don't think anybody else would be
11 authorized to do that.
12 　Q. (BY MR. BERNDT) Do you have the authority
13 to lift or alter the Vision-imposed restrictions on
14 Mr. Robinson's activities?
15 　A. No.
16 　Q. Have you had any discussions with anyone
17 regarding the duration of the Vision-imposed
18 restrictions on Mr. Robinson's activities?
19 　　　MR. LANCILOTI: Object to the form of
20 the question to the extent that it calls for
21 attorney/client that would require you to divulge
22 attorney/client communications. I would instruct
23 you not to answer with that respect, outside of
24 that, you can answer the question.
25 　　　THE WITNESS: My only discussion that

Page 76

1 I can remember would have been with the same
2 executives with attorney present.
3 　Q. (BY MR. BERNDT) If Lakeview dropped its
4 lawsuit against Mr. Robinson, would the
5 Vision-imposed restrictions on Mr. Robinson's
6 activities continue?
7 　　　MR. LANCILOTI: Object to the form of
8 the question as calls for speculation. You can
9 answer over that.
10 　　　THE WITNESS: I can't speak for the
11 other executives. From my perspective, yes.
12 　Q. (BY MR. BERNDT) Have you been involved in
13 communications regarding who would monitor
14 Mr. Robinson's compliance with the Vision-imposed
15 restrictions?
16 　　　(The record was read as requested.)
17 　　　MR. LANCILOTI: Again, object to the
18 form of the question to the extent that it requires
19 you to reveal any attorney/client communications.
20 I would instruct you not to answer to that extent,
21 but outside of that, you can answer the question.
22 　　　THE WITNESS: Yes. I've had
23 discussions with Kristine Brooks, counsel, and I
24 believe in that discussion, Tim Keithahn was
25 involved also in that discussion.

Page 77

1 　Q. (BY MR. BERNDT) Is that the only
2 discussion you've had regarding who would monitor
3 Mr. Robinson's compliance with the Vision-imposed
4 restrictions?
5 　A. To my memory, yes.
6 　Q. And how many discussions did you have
7 regarding who would monitor Mr. Robinson's
8 compliance with the Vision-imposed restrictions?
9 　A. At least two that I can remember.
10 　Q. Was Ms. Brooks involved in all of those
11 discussions?
12 　A. Yes.
13 　Q. To your knowledge, is anyone at Vision
14 reviewing Mr. Robinson's e-mails for compliance
15 with Vision-imposed restrictions?
16 　　　MR. LANCILOTI: Object to the form of
17 the question to the extent that it's been asked and
18 answered previously. You can answer over that.
19 　　　THE WITNESS: I do not know.
20 　Q. (BY MR. BERNDT) Do you know if anyone is
21 reviewing Mr. Robinson's phone records for
22 compliance with the Vision-imposed restrictions?
23 　A. I don't know.
24 　Q. To some extent you're relying on
25 Mr. Robinson's integrity and honesty to achieve

(210) 377-3027　　　ESQUIRE DEPOSITION SERVICES　　　FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100　　SAN ANTONIO, TEXAS 78230　　　(800) 969-3027
20 (Pages 74 to 77)

1b9beaaf-d491-4bab-b861-3f58e96771a5

STEPHEN MASSEY  CONFIDENTIAL  October 3, 2005
ATTORNEY'S EYES ONLY

Page 78

1 compliance with the Vision-imposed restrictions; is
2 that correct?
3  A. Yes.
4  Q. You are aware that Mr. Robinson lied to a
5 number of people at Lakeview about his intention to
6 join Vision, correct?
7  A. Yes.
8  Q. How do you know that?
9  A. Mr. Robinson shared that with me in
10 conversations.
11  Q. When was the first time Mr. Robinson
12 shared with you that he had lied to Vision about
13 his intention of joining Lakeview — to join
14 Vision?
15  A. Shortly before he joined Vision. I don't
16 know the exact date or the exact timeframe, but
17 within a week or two before he joined Vision.
18  Q. How did he share that with you?
19  A. Via telephone call.
20  Q. Did Mr. Robinson call you or did you call
21 him?
22  A. I don't remember.
23  Q. What did you say to him when you learned
24 that he was going to lie to Lakeview?
25  MR. LANCILOTI: Object to the form of

Page 79

1 the question as — I think it misstates the record
2 and implies facts not in evidence that he had told
3 him — or he had already lied — or that he had not
4 yet lied when he told Mr. Massey. I don't think
5 the timing is there.
6  MR. BERNDT: That's fine. Let me
7 rephrase.
8  Q. (BY MR. BERNDT) What did you say to
9 Mr. Robinson when you learned that Mr. Robinson had
10 lied to Lakeview?
11  A. I don't remember the exact response.
12  Q. Do you remember generally what you said to
13 Mr. Robinson about his lies to Lakeview?
14  A. We did not discuss it at length. My
15 response, I assume, would be the same as today.
16 It's that it's a shame it has to happen. But
17 that's the way it was.
18  Q. Do you remember anything else about your
19 response to Mr. Robinson about his lies to
20 Lakeview?
21  A. No. Didn't discuss it that much.
22  Q. So you told Mr. Robinson it's a shame it
23 has to happen?
24  A. No, I did not. No, I did not tell him
25 that. That is my response today.

Page 80

1  Q. Well, what was your response then?
2  A. I don't remember my exact response then.
3  Q. Do you remember anything about your
4 response then?
5  A. Not in detail. Not in detail.
6  Q. I didn't ask for details. Do you remember
7 generally your response to Mr. Robinson when he
8 told you that he was going to lie to Lakeview?
9  MR. LANCILOTI: Again, I object to
10 the form of the question. It's the same issue that
11 we had before.
12  MR. BERNDT: Yeah, I'll rephrase.
13  Q. (BY MR. BERNDT) Do you remember generally
14 about your response to Mr. Robinson when he said he
15 had lied to Lakeview?
16  A. I don't remember generally or
17 specifically. I can tell you my feeling was that
18 it's a shame that it had to happen. But I left it
19 to his discretion and I agreed with it.
20  Q. Did you just testify that you agreed with
21 Mr. Robinson's decision to lie to Lakeview?
22  A. Yes.
23  Q. And did you agree with it before he left
24 Lakeview?
25  A. Yes.

Page 81

1  Q. And you agreed today that — with
2 Mr. Robinson's decision to lie to Lakeview?
3  A. Repeat the question.
4  (The record was read as requested.)
5  THE WITNESS: Yes.
6  Q. (BY MR. BERNDT) Do you believe that
7 Mr. Robinson's decision to lie to his colleagues at
8 Lakeview was unethical?
9  MR. LANCILOTI: Object to the form of
10 the question as to relevance. You can answer over
11 that.
12  THE WITNESS: No. Due to the
13 circumstances, no.
14  Q. (BY MR. BERNDT) If Mr. Robinson testified
15 that his decision to lie to his colleagues at
16 Lakeview was unethical, would you disagree with
17 Mr. Robinson?
18  A. Yeah.
19  Q. Do you think Mr. Robinson's lies to his
20 colleagues at Lakeview show dishonesty?
21  A. To the extent of the lie itself, yes.
22  Q. Mr. Robinson was nervous that a rumor was
23 going to leak out that he was going to join Vision
24 before he left Lakeview, right?
25  A. Yes.

(210) 377-3027  ESQUIRE DEPOSITION SERVICES  FAX (210) 344-6016
7800 IH-10 WEST, SUITE 100  SAN ANTONIO, TEXAS 78230  (800) 969-3027

21 (Pages 78 to 81)

1b9beaaf-d491-4bab-b861-3f58e96771a5

STEPHEN MASSEY  CONFIDENTIAL  October 3, 2005
ATTORNEY'S EYES ONLY

Page 82

1  Q. And he shared that with you?
2  A. Yes.
3  Q. Do you know why Mr. Robinson was concerned
4  that his job with Vision would leak to his
5  colleagues at Lakeview?
6      THE WITNESS: Could you repeat the
7  question?
8      (The record was read as requested.)
9      THE WITNESS: Do I know why he was
10 concerned? I'm going to go from high level memory
11 again. I don't remember details. When he
12 resigned, there were some rumors about what he was
13 going to do, and I think that's where the first
14 concern came up.
15 Q. (BY MR. BERNDT) And what were those
16 concerns?
17     MR. LANCILOTI: Object to the form of
18 the question to the extent that it calls for
19 speculation. You can answer over that.
20     THE WITNESS: The conversations I had
21 with Eric were that he was extremely concerned that
22 it would disrupt his sales group and draw their
23 focus away from what they were supposed to be doing
24 and felt it was not productive for them.
25 Q. (BY MR. BERNDT) Did you agree with

Page 83

1  Mr. Robinson not to send an announcement of his
2  hiring by Vision till after he left Lakeview?
3  A. Yes.
4  Q. And you had made that agreement on behalf
5  of Vision, correct?
6  A. Yes.
7  Q. And at that time, you knew that he had
8  lied to Lakeview about his intention to join
9  Vision?
10 A. Yes.
11 Q. You knew at that point that if Lakeview
12 learned that he was going to join Vision, that
13 Mr. Robinson would be forced to immediately leave
14 Lakeview, correct?
15 A. Yes. To qualify that, I didn't know that
16 for a fact, but I certainly would have guessed that
17 to be the way it would be.
18 Q. That isn't the normal procedure at Vision,
19 is it? Normally an announcement goes out about a
20 new hire before they join Vision, correct?
21 A. Not by my instruction. My announcements
22 go out after they start, not before. It is --
23 Vision has in the past made some announcements
24 before.
25 Q. In fact, Vision employees asked you why

Page 84

1  there couldn't be an announcement before he joined
2  Vision, correct?
3  A. No.
4  Q. Are you sure about that?
5  A. There was an e-mail that went out that
6  they were going to make an announcement, and I sent
7  an e-mail back and said, Do not make the
8  announcement. They didn't ask me. I responded to
9  that proactively.
10 Q. Were there further questions about why
11 there couldn't be an announcement from Vision
12 employees?
13 A. Not to my recollection, no.
14 Q. Did Mr. Robinson call you in late
15 April 2005 and express concern that his intention
16 to join Vision had leaked.
17 A. I don't remember the exact timing, but
18 yes, there was a call in that frame.
19 Q. What did he say to you?
20 A. He said that he had -- let's see if I can
21 remember correctly. He had been called by a Vision
22 employee and the employee had said that the rumor
23 around Lakeview headquarters was that he had gone
24 to Vision or was going to Vision.
25 Q. He was called by a Vision employee?

Page 85

1  A. I'm sorry. A Lakeview employee.
2  Q. Did he say who that employee was?
3  A. Yes.
4  Q. And who was that?
5  A. Bob Johnson.
6  Q. What did you say to him?
7  A. My general response was that I have no
8  idea how it would have gotten to Bob Johnson, that
9  I was not aware of anybody talking to anybody at
10 Lakeview, and that we're a very limited number of
11 people at Vision that even knew that he was coming
12 onboard, and it was a mystery to me how it got out
13 if it really got out.
14 Q. Did you tell Mr. Robinson that you would
15 investigate whether the rumors had come from
16 Vision?
17 A. Something to that effect, yes.
18 Q. Did you investigate whether the rumors had
19 come from Vision?
20 A. Yes.
21 Q. What did you do to investigate?
22 A. I called the people that I knew were aware
23 of his being hired, quizzed their communications
24 with other employees of Vision and any
25 communications outside of Vision.

(210) 377-3027            ESQUIRE DEPOSITION SERVICES        FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100    SAN ANTONIO, TEXAS 78230        (800) 969-3027
22 (Pages 82 to 85)

1b9beaaf-d491-4bab-b861-3f58e96771a

STEPHEN MASSEY　　　　　CONFIDENTIAL　　　　　October 3, 2005
　　　　　　　　　　　　ATTORNEY'S EYES ONLY

Page 86

1　Q. Who did you call?
2　A. Cathleen Keene, the director of human
3　resources, Tim Keithahn, Alan Arnold, Don Scott.
4　I'm not sure that I contacted one of the other
5　people in human resources or whether I just relied
6　on Cathy Keene. I don't remember.
7　Q. Did anyone say that they had communicated
8　to anyone outside Vision the fact that Mr. Robinson
9　was joining Vision?
10　A. No. Nobody admitted to me that they had
11　communicated outside of Vision.
12　Q. Did Mr. Robinson tell you that he was
13　disturbed by the rumors?
14　A. I don't know if disturbed was the word but
15　he was concerned.
16　Q. Did he accuse you of spreading the rumor?
17　A. No.
18　Q. Allan Campbell also lied about leaving
19　Lakeview, correct?
20　　　　MR. LANCILOTI: Object to the form of
21　the question as to relevance, and I think if you're
22　going to go into questions about Allan Campbell
23　that are not related to this litigation, and again,
24　this would be along the same lines as when you were
25　asking Mr. Massey questions about his involvement

Page 87

1　in iTera, I think it's being asked for an improper
2　purpose and I would suggest that we call the judge
3　and see if he'll allow us to go -- allow you to go
4　into questions about Allan Campbell. I don't know
5　if you're intending on doing that now, but if you
6　were, I'd instruct the witness not to answer.
7　　　　MR. BERNDT: So you're objecting
8　based on relevance again.
9　　　　MR. LANCILOTI: Relevance and I think
10　it's being asked for an improper purpose. Has
11　nothing to do with this lawsuit.
12　　　　MR. BERNDT: Okay. I'll make my
13　record then.
14　Q. (BY MR. BERNDT) Are you following your
15　counsel's instruction not to answer?
16　A. Yes.
17　Q. Okay. Vision and Allan Campbell also
18　agreed there would be no announcement about his
19　joining Vision, correct?
20　　　　MR. LANCILOTI: Same objection.
21　　　　MR. BERNDT: Same instruction?
22　　　　MR. LANCILOTI: Same everything, yes.
23　I mean, questions with regard to Allan Campbell,
24　yes.
25　　　　MR. BERNDT: Okay.

Page 88

1　Q. (BY MR. BERNDT) In fact, in the same
2　e-mail when you instructed HR not to announce
3　Mr. Robinson's employment at Vision, you asked HR
4　not to announce Mr. Campbell's employment with
5　Vision, correct?
6　A. I don't remember specifically but that's
7　possible.
8　Q. Mr. Campbell and Mr. Robinson left
9　Lakeview at about the same time, correct?
10　A. No. Memory is that -- I don't know the
11　exact date that Mr. Campbell left Lakeview.
12　Q. Did Mr. Robinson ask you not to send an
13　announcement that he was joining Vision?
14　A. No. That was my decision.
15　Q. And you had told Mr. Robinson that you
16　wouldn't send an announcement that he was joining
17　Vision, correct?
18　A. Prior to his coming onboard, yes.
19　Q. And you told HR that you actually had an
20　agreement with Mr. Robinson not to send an
21　announcement, correct?
22　A. That's possible, yes.
23　Q. Mr. Robinson was worried about his
24　contractual obligations to Lakeview, correct?
25　　　　MR. LANCILOTI: Object to the form of

Page 89

1　the question.
2　　　　MR. BERNDT: Let me rephrase,
3　actually.
4　Q. (BY MR. BERNDT) Prior to Mr. Robinson's
5　leaving Lakeview, Mr. Robinson was worried about
6　his contractual obligations to Lakeview, correct?
7　　　　MR. LANCILOTI: Object to the form of
8　the question, calls for speculation as to what
9　Mr. Robinson was worried about. You can answer
10　over that.
11　　　　THE WITNESS: He was concerned.
12　Q. (BY MR. BERNDT) And how do you know he
13　was concerned?
14　A. He voiced -- he voiced an opinion and he
15　thought he should contact counsel and get advice.
16　Q. When was that?
17　A. I don't know exactly when that occurred.
18　It had to have been sometime in late 2004.
19　Q. Do you know if Mr. Robinson contacted
20　counsel?
21　A. He told me that he did.
22　Q. Did Mr. Robinson engage his own counsel or
23　did he contact Vision's counsel?
24　　　　MR. LANCILOTI: Object. Calls for
25　speculation. You can answer over that.

(210) 377-3027　　　　　ESQUIRE DEPOSITION SERVICES　　　　FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100　　　SAN ANTONIO, TEXAS 78230　　　　　(800) 969-3027

23 (Pages 86 to 89)

1b9beaaf-d491-4bab-b861-3f58e96771a5

STEPHEN MASSEY
CONFIDENTIAL
ATTORNEY'S EYES ONLY
October 3, 2005

Page 94

1  MR. LANCILOTI: Objection to the
2  extent it calls for speculation.
3  MR. BERNDT: Let me rephrase.
4  Q. (BY MR. BERNDT) Why did Mr. Robinson tell
5  you that he was turning down Vision's employment
6  offer?
7  MR. LANCILOTI: Same objection,
8  speculation.
9  THE WITNESS: He told me it was not
10 the right decision for he and his family at that
11 time.
12 Q. (BY MR. BERNDT) Did he mention his
13 non-compete agreement with Lakeview during that
14 conversation?
15 A. No.
16 Q. How long was that conversation?
17 A. Not very long. I was disappointed.
18 Q. Did you try and convince Mr. Robinson that
19 his -- that the non-compete agreement with Lakeview
20 wouldn't be a problem?
21 MR. LANCILOTI: I'm going to object
22 there to the extent it would require you to reveal
23 any attorney/client communications that you had not
24 only in this case but any other case where you had
25 attorney/client communications regarding that

Page 95

1  non-compete in the Lakeview agreement. I instruct
2  you not to answer that question to that extent.
3  Above that you can answer it or beyond that.
4  THE WITNESS: I decided to take his
5  current Lakeview employment agreement to counsel
6  and to get advice at that point.
7  Q. (BY MR. BERNDT) And did you then convey
8  that advice to Mr. Robinson?
9  A. I'm trying to remember the conversations.
10 I assume that I did. That conversation -- when we
11 reviewed the contract and when it came back, that
12 conversation actually, to my memory, had two or
13 three people on the phone at the same time which
14 would have been Tim Keithahn, Kristine Brooks and
15 myself.
16 Q. And then later did you convey what you
17 discussed with Ms. Brooks and Mr. Keithahn to
18 Mr. Robinson?
19 A. That conversation had Mr. Robinson on the
20 call.
21 Q. At that point, was Ms. Brooks representing
22 Mr. Robinson in any way?
23 MR. LANCILOTI: Object to the form of
24 the question as it calls for speculation and object
25 as to foundation. You can answer over that if you

Page 96

1  know.
2  THE WITNESS: Repeat the question,
3  please.
4  (The record was read as requested.)
5  MR. LANCILOTI: Same objection.
6  THE WITNESS: I don't think so, no.
7  Q. (BY MR. BERNDT) Well, what did you
8  discuss during that conversation?
9  MR. LANCILOTI: Object to the form of
10 the question to the extent it requires you to
11 reveal any attorney/client communications and ask
12 you not to answer that. The reason I'm making that
13 objection, Will, now is that this is Mr. Robinson's
14 privilege to waive, and he -- to the extent he
15 knows if there was a relationship between Kristine
16 Brooks and attorney and Eric Robinson, he's
17 answered that, but he's not sure. I don't want to
18 take the chance of waiving that privilege to
19 another witness when there's an attorney/client
20 relationship possibly between Ms. Brooks and
21 Mr. Robinson.
22 MR. BERNDT: So Dan, you're
23 suggesting there's a possibility that Mr. Robinson
24 engaged Ms. Brooks, Vision's inside counsel, as his
25 attorney?

Page 97

1  MR. LANCILOTI: I'm saying to the
2  extent that that could happen, yes, and I'm not
3  going to allow Mr. Massey to waive that privilege.
4  MR. BERNDT: Are you suggesting that
5  did happen?
6  MR. LANCILOTI: I'm saying to the
7  extent it might have happened. I'm not going to
8  allow Mr. Massey to waive that privilege for
9  Mr. Robinson. They were all part of the call,
10 obviously, there was legal advice being asked and
11 delivered to Mr. Robinson. I don't know to the
12 extent Ms. Brooks does work outside of Vision, to
13 the extent she's in private practice as well being
14 in-house, I do not know, and I'm just simply not
15 going to waive it for Mr. Robinson at this time.
16 Q. (BY MR. BERNDT) All right. Well,
17 Mr. Massey, it sounds like we're going to have to
18 come back and take your deposition again but --
19 So you're following your counsel's
20 instructions?
21 A. Yes.
22 Q. So you can't tell me --
23 MR. BERNDT: You're not going to
24 allow him to tell me anything about that
25 conversation?

(210) 377-3027
7800 IH-10 WEST, SUITE 100
ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230
FAX(210) 344-6016
(800) 969-3027
25 (Pages 94 to 97)

STEPHEN MASSEY
CONFIDENTIAL
ATTORNEY'S EYES ONLY
October 3, 2005

Page 98

1  MR. LANCILOTI: To the extent that it
2  doesn't involve him to reveal any legal advice that
3  was sought or given in that discussion where
4  Kristine was present, I'm asserting a privilege.
5  Q. (BY MR. BERNDT) Okay. With that caution,
6  tell me everything you can, Mr. Massey, about that
7  conversation.
8  A. If we can have five minutes, I will ask
9  what I can and cannot give you. Until I get the
10  advice, I will give no details on the conversation
11  at all.
12  Q. So you're refusing to answer the
13  question -- pending question until after you confer
14  with counsel?
15  A. On advice of counsel, yes.
16  Q. Okay. Generally that's improper,
17  Mr. Massey, but in this case go ahead, I guess, if
18  that's what you're going to do.
19      MR. LANCILOTI: So what are we doing?
20      MR. BERNDT: I guess he wants a
21  break.
22      (Recess from 11:20 to 11:26)
23      MR. LANCILOTI: With respect to the
24  attorney/client issue that we have right now, Will,
25  the concern I have without divulging any

Page 99

1  attorney/client communications that I had with
2  Mr. Massey is that Mr. Massey did not -- he was
3  confusing the facts as to who was present, and I
4  think he said he thought Eric was present. And I
5  think we've confirmed outside that Eric was not
6  present in those calls. I don't want Mr. Massey to
7  go into communications that he had with Vision
8  Solutions in-house counsel that are privileged and
9  discuss that on the record simply because he is
10  confused about who was present. And I think that
11  we've now confirmed that Eric was not on those
12  calls.
13      MR. BERNDT: Okay. Let me follow up.
14  Q. (BY MR. BERNDT) Mr. Massey, was
15  Mr. Robinson included on the calls you had with
16  Kristine Brooks and Ken Keithahn regarding
17  Mr. Robinson's Lakeview employment agreement?
18  A. No. After confirming with Eric, he was
19  not.
20  Q. And do you have a copy of Lakeview's
21  employment agreement with Mr. Robinson?
22  A. No.
23  Q. Mr. Robinson never gave you a copy of his
24  Lakeview employment agreement?
25  A. Yes. I gave it to counsel. I gave it to

Page 100

1  Kristine Brooks for evaluation, and I don't have a
2  copy of it.
3  Q. But Mr. Robinson did give you a copy of
4  his Lakeview employment agreement?
5      MR. LANCILOTI: Objection; asked and
6  answered.
7  Q. (BY MR. BERNDT) And when did that happen?
8  A. I don't remember the timeframe.
9  Q. But it was prior to the conversations that
10  you had with Kristine Brooks and Ken Keithahn in
11  December 2004?
12  A. Yes.
13  Q. What did you tell Mr. Robinson about your
14  conversations with Kristine Brooks and Ken
15  Keithahn?
16  A. I told him that the -- I have to remember
17  the conversation. I don't remember whether I told
18  him what came out of the conversation or whether
19  Kristine had a conversation with Dan Lancilloti in
20  regards to that conversation. To be honest with
21  you, I don't remember if I had a specific
22  conversation with Eric on that or if that went from
23  Kristine to Dan.
24  Q. And we're in the December 2004 timeframe,
25  correct?

Page 101

1  A. Yes.
2  Q. So Mr. Lanciloti was involved in some of
3  these conversations in December 2004?
4  A. By my memory, yes.
5  Q. Do you recall any conversations -- let's
6  start over.
7      Do you recall discussing
8  Mr. Robinson's Lakeview employment agreement with
9  Mr. Robinson at any time?
10  A. I remember we discussed it. I don't
11  remember the timeframe with which we discussed it,
12  but I remember we discussed it.
13  Q. Do you recall discussing Mr. Robinson's
14  employment agreement in December 2004?
15      MR. LANCILOTI: Object to the form of
16  the question; asked and answered.
17      THE WITNESS: I don't remember the
18  timeframe.
19  Q. (BY MR. BERNDT) How many discussions have
20  you had with Mr. Robinson about his Lakeview
21  employment contract?
22  A. I don't know. One, two.
23  Q. What do you recall about the conversation
24  or conversations you had with Mr. Robinson about
25  his Lakeview employment contract?

(210) 377-3027
7800 IH-10 WEST, SUITE 100
26 (Pages 98 to 101)

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

1b9beaaf-d491-4bab-b861-3f58e9677ta5

STEPHEN MASSEY  CONFIDENTIAL  October 3, 2005
ATTORNEY'S EYES ONLY

Page 102

1  MR. LANCILOTI: To the extent that
2  would require -- I'm objecting to the form of the
3  question to the extent it would require you to
4  divulge any communications you had with counsel.
5  MR. BERNDT: Just so I'm clear, are
6  you objecting to the form to the -- to Mr. Massey
7  describing conversations where counsel was present
8  or conversations that he had previously had with
9  counsel and then shared with Mr. Robinson?
10  MR. LANCILOTI: I think your question
11  is confusing as to -- when you say -- can you read
12  his last question back?
13  (The record was read as requested.)
14  MR. LANCILOTI: I think that that's a
15  vague question and it could go into attorney/client
16  communications. The question just says what do you
17  recall about it. I mean, do you want to know what
18  he said? Is there a time period you want to know?
19  MR. BERNDT: Thank you.
20  Q. (BY MR. BERNDT) What did you say to
21  Mr. Robinson about his Lakeview employment
22  contract?
23  MR. LANCILOTI: Object as to
24  foundation. What point in time?
25  MR. BERNDT: At any time.

Page 103

1  MR. LANCILOTI: Again, I'm going to
2  object to the form of the question again to the
3  extent that it requires Mr. Massey to divulge any
4  attorney/client communications. To the extent you
5  can tell counsel without divulging those
6  communications -- to the extent you can testify
7  about things that were said to Mr. Robinson without
8  divulging attorney/client communications, you can
9  do that.
10  THE WITNESS: The discussions
11  centered around the fact that legal counsel had
12  advised --
13  MR. LANCILOTI: Object to you
14  answering anything discussing -- anything that
15  legal counsel has advised Vision or advised you or
16  that legal counsel advised Mr. Robinson.
17  Q. (BY MR. BERNDT) So Mr. Massey, did you
18  tell Mr. Robinson what legal counsel had advised
19  you about the Lakeview employment contract?
20  MR. LANCILOTI: Objection as to
21  foundation. You can answer over that.
22  THE WITNESS: I'm trying to remember
23  a conversation that actually had that topic. I
24  don't remember specific details of a conversation
25  where we discussed it in that form, no. We

Page 104

1  discussed very high level, he said that -- the
2  response from his attorney, I discussed very high
3  level what had been told by our attorney and the
4  bottom line was we agreed to continue to talk.
5  Q. (BY MR. BERNDT) Let's make a record now.
6  What did Mr. Robinson tell you about
7  what his attorney had told him about the Lakeview
8  employment contract?
9  MR. LANCILOTI: I'm objecting to the
10  form of the question as being privileged to the
11  extent it requires you to divulge anything that was
12  discussed with counsel, any attorney/client
13  communications, instruct you not to answer. Above
14  that, Will, I can explain it if you want me to, but
15  you had objected previously to me making a speaking
16  objection.
17  MR. BERNDT: Sure. Explain it.
18  MR. LANCILOTI: Obviously, there's a
19  joint representation here and we do not have a
20  foundation as to what conversations and what time
21  period we're talking about. Any conversations that
22  were had after the joint representation was
23  established, which I do not think Mr. Massey is --
24  not being an attorney would understand, those
25  communications are still privileged. So I'm

Page 105

1  instructing him not to answer with respect to that.
2  If you want to have a timeframe and you establish
3  that there was no attorney/client relationship, but
4  that has not happened yet.
5  Q. (BY MR. BERNDT) All right. Did you have
6  any conversations with Mr. Robinson about his
7  employment agreement prior to him leaving Lakeview?
8  A. Yes.
9  Q. And in those conversations, did
10  Mr. Robinson tell you what his attorney had told
11  him about the Lakeview employment contract?
12  A. Not in detail, no.
13  Q. Did he tell you generally what his
14  attorneys had told him about the Lakeview
15  employment contract?
16  A. The only thing that I recall --
17  MR. LANCILOTI: Just object to the
18  extent that it requires you to divulge any of those
19  communications. Any attorney/client
20  communications.
21  THE WITNESS: The result of that
22  conversation was he said he was willing to continue
23  talking to Vision.
24  Q. (BY MR. BERNDT) That's not my question.
25  The question is: Did he tell you what his attorney

(210) 377-3027  ESQUIRE DEPOSITION SERVICES  FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100  SAN ANTONIO, TEXAS 78230  (800) 969-3027

27 (Pages 102 to 105)

STEPHEN MASSEY  CONFIDENTIAL  October 3, 2005
ATTORNEY'S EYES ONLY

Page 106

1  had told him about the Lakeview employment
2  agreement?
3       MR. LANCILOTI: Yes or no.
4       THE WITNESS: No. No. Not in
5  detail, no.
6   Q. (BY MR. BERNDT) Did he tell you generally
7  what his attorney had told him about the Lakeview
8  employment contract?
9   A. No. He told me he was comfortable in
10  continuing discussions.
11   Q. Is that all he said?
12   A. To my recollection, yes.
13   Q. And did you have conversations with
14  Mr. Robinson when you discussed what Vision's
15  counsel had told you about Mr. Robinson's Lakeview
16  employment contract?
17       MR. LANCILOTI: Again, it's yes or
18  no.
19       THE WITNESS: I really don't
20  remember, but my recollection of some conversation,
21  yeah, yes.
22   Q. (BY MR. BERNDT) And what did you tell
23  Mr. Robinson that Vision's counsel had told you
24  about Mr. Robinson's Lakeview employment agreement?
25       MR. LANCILOTI: Object to the form of

Page 107

1  the question. Seeks disclosure of information
2  which is protected by the attorney/client
3  privilege. To the extent that your answer would
4  disclose any of those communications, I would
5  instruct you not to answer. If there's anything
6  that was said that goes beyond that then you can
7  answer the question.
8       MR. BERNDT: Okay. I think we're
9  going to have to do this one more time.
10   Q. (BY MR. BERNDT) Prior to Mr. Robinson
11  leaving Lakeview, did you have conversations with
12  Mr. Robinson about -- involving discussions of what
13  Visions's attorneys had told you about
14  Mr. Robinson's Lakeview employment contract?
15       MR. LANCILOTI: Could you read that
16  back?
17       (The record was read as requested.)
18       MR. LANCILOTI: Object to the form of
19  the question, calls for attorney/client privilege
20  information. Instruct you not to answer to the
21  extent you have to divulge any of that information.
22       THE WITNESS: I told Eric that we
23  were willing to continue conversations based on the
24  attorney's advice.
25   Q. (BY MR. BERNDT) And did you discuss any

Page 108

1  details about whether any provisions of Eric's
2  Lakeview employment contract would be enforceable?
3       MR. LANCILOTI: Same objection to the
4  form of the question. Seeks attorney/client
5  information.
6       THE WITNESS: We discussed that there
7  were some parts of it that might not be enforceable
8  and some that might be enforceable.
9   Q. (BY MR. BERNDT) Which parts did you
10  discuss?
11       MR. LANCILOTI: Again, to the extent
12  any of this came from attorney/client
13  communications, I would ask, one, strike that
14  testimony if that came from attorney/client
15  testimony, but also, instruct you not to answer if
16  that's where it came from. If it's from somewhere
17  else other than your communications with counsel,
18  then you can go ahead and answer.
19       THE WITNESS: At this point,
20  everything that I had at that point came from
21  counsel.
22   Q. (BY MR. BERNDT) And when you say it "came
23  from counsel," it came from Vision's counsel,
24  correct?
25       MR. LANCILOTI: Object to the form of

Page 109

1  the question as vague as to Vision's counsel. You
2  can answer over that.
3       THE WITNESS: Came from Kristine
4  Brooks.
5   Q. (BY MR. BERNDT) Thank you.
6       And these conversation took place
7  before Mr. Robinson left Lakeview, correct?
8   A. Yes.
9       MR. BERNDT: All right. Dan, I think
10  we're clear?
11       MR. LANCILOTI: I think we are.
12       MR. BERNDT: And, Dan, just for the
13  record, you're going to object to any further
14  questions about the specifics of what Ms. Brooks
15  told Mr. Massey and then Mr. Massy conveyed to
16  Mr. Robinson, correct?
17       MR. LANCILOTI: I'm going to object
18  to any questions that go into or would require
19  Mr. Massey to divulge any communications he had
20  with, I guess, Lakeview counsel and inside and
21  outside counsel, Vision counsel, and Mr. Robinson's
22  counsel. There's been, again, no testimony nor do
23  I think Mr. Massey has the foundation or could lay
24  a foundation as to when any type of joint
25  representation was established or whether there was

STEPHEN MASSEY
CONFIDENTIAL
ATTORNEY'S EYES ONLY
October 3, 2005

Page 110
1  a relationship between counsel and Mr. Robinson.
2  So based on that, I'm not going to let Mr. Massey
3  testify as to communications that are not his
4  privilege to waive.
5      Q. (BY MR. BERNDT) Now, you said earlier
6  that you understood that Mr. Robinson had engaged
7  counsel prior to leaving Lakeview, correct?
8      A. Yes.
9      Q. And was that counsel Mr. Lanciloti?
10         MR. LANCILOTI: Object to the form of
11 the question, calls for speculation. You can
12 answer over that.
13         THE WITNESS: Initially, no.
14     Q. (BY MR. BERNDT) When did -- if you know,
15 when did Mr. Lanciloti begin to represent
16 Mr. Robinson?
17         MR. LANCILOTI: Calls for
18 speculation.
19         THE WITNESS: I don't know
20 specifically.
21     Q. (BY MR. BERNDT) Do you know if
22 Mr. Lanciloti began to represent Mr. Robinson prior
23 to Mr. Robinson's leaving Lakeview?
24         MR. LANCILOTI: Objection; asked and
25 answered. You can answer if you know.

Page 111
1         THE WITNESS: I don't remember the
2  timeline that I was aware, so I don't know.
3      Q. (BY MR. BERNDT) Do you know if
4  Mr. Robinson engaged any counsel other than
5  Mr. Lanciloti?
6      A. I do not know.
7         MR. BERNDT: I'd like to mark as
8  Exhibit 2 a document Bates stamped Robinson 627
9  through 643.
10        (Exhibit No. 2 marked)
11     Q. (BY MR. BERNDT) Mr. Massey, do you
12 recognize Exhibit 2 and the documents attached to
13 the e-mail in the first page of Exhibit 2?
14     A. I recognize -- yeah, I do.
15     Q. What is that document?
16     A. It's a listing of the accounts receivable
17 for North America accounts.
18     Q. Is any of the information on that document
19 confidential?
20     A. Yeah.
21     Q. Which information on that document is
22 confidential?
23     A. All of the customer names and all the
24 dollar amounts due.
25     Q. Is there any other information on that

Page 112
1  document that's confidential?
2      A. It appears like everything in here is
3  confidential.
4      Q. And why is that information confidential?
5      A. It has to do with all of our customer
6  lists, amounts payable or receivable due from them,
7  type of expense, training, license dollar amount.
8  Pretty confidential.
9      Q. If Vision's competitors had access to any
10 of that information, would it give them a
11 competitive advantage?
12        THE WITNESS: Repeat.
13        (The record was read as requested.)
14        THE WITNESS: Yes.
15     Q. (BY MR. BERNDT) Is Vision's client list
16 confidential to Vision?
17     A. To an extent, yes. There's to an extent,
18 no.
19     Q. And how is Vision's client list not
20 confidential to Vision?
21     A. As is typical in the industry, many of our
22 customer lists are on our website.
23     Q. If that document was revised that only the
24 list of customers was listed on the document, would
25 that document be confidential?

Page 113
1      A. Still to the degree that it had a customer
2  listing, yes.
3      Q. And why is that?
4      A. Well, even though some of our customers
5  are on the website, some of them are not. And I --
6  the fact that somebody wants to go find our
7  customer list is not that difficult to do, but I'm
8  not going to make it easy.
9      Q. And it's still confidential to Vision?
10     A. Yes. To that extent.
11     Q. Is Vision's pricing to its customers
12 confidential to Vision?
13     A. Yes.
14     Q. Are Vision's sales strategies confidential
15 to Vision?
16     A. Yes.
17     Q. Are Vision's internal communications
18 regarding its customers confidential?
19     A. Yes.
20     Q. Is Vision's information about potential
21 prospects confidential?
22     A. Yes.
23     Q. How does Vision maintain the
24 confidentiality of its sales information?
25     A. To a large degree, it's with the trust and

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027
29 (Pages 110 to 113)

1b9beaaf-d491-4bab-b861-3f58e96771a5

STEPHEN MASSEY  CONFIDENTIAL  October 3, 2005
ATTORNEY'S EYES ONLY

Page 118

1 A. Yes.
2 Q. Does the three year sales plan include
3 information about the North America region?
4 A. Yes.
5 Q. Does the three year sales plan contain
6 information regarding particular regions within
7 North America?
8 A. Yes.
9 Q. Does it include projections for sales
10 within the particular regions in North America?
11 A. Yes.
12 Q. When was the three year sales plan
13 created?
14 MR. LANCILOTI: Object to the form of
15 the question, calls for speculation. You can
16 answer if you can.
17 THE WITNESS: I can tell you
18 generally when it was created. It was created in
19 the September/October 2004 timeframe.
20 Q. (BY MR. BERNDT) Has it been revised since
21 then?
22 A. No.
23 Q. Is Vision a competitor of Lakeview?
24 A. Yes.
25 Q. So Lakeview and Vision compete in the same

Page 119

1 geographic markets?
2 A. Yes.
3 Q. So they sell the same general types of
4 products?
5 A. There is some overlap, yes.
6 Q. Is part of Mr. Robinson's job to help
7 Vision compete with its competitors?
8 A. Yes. Within his areas of responsibility.
9 Q. Including Lakeview?
10 A. Yes.
11 MR. BERNDT: Let me mark as Exhibit 3
12 a document Bates stamped Vision 1 through 3.
13 (Exhibit No. 3 marked)
14 Q. (BY MR. BERNDT) Do you recognize
15 Exhibit 3?
16 A. Yes.
17 Q. What is it?
18 A. Looks like the job description for the VP
19 of North America Sales.
20 Q. Is this the most current job description
21 for the VP for North America Sales?
22 A. I don't think so. It was amended to
23 include Latin America though. It's now the Vice
24 President of Sales Americas.
25 Q. When did that amendment occur?

Page 120

1 A. Before I was with Vision.
2 MR. BERNDT: We'd like to state on
3 the record that we've asked for job descriptions
4 for Vice President of Americas repeatedly and this
5 is the only document that's been produced.
6 MR. LANCILOTI: I just want to make a
7 statement to the -- this is what has been produced
8 by Vision. I will look into seeing if there is a
9 more current version of this, and if there is and
10 it's discoverable, I will produce it immediately.
11 This is what I've received.
12 Q. (BY MR. BERNDT) Mr. Massey, if you look
13 at the numbers listed under essential duties and
14 responsibilities on Page Vision 1?
15 A. Uh-huh.
16 Q. Do those duties and responsibilities apply
17 to Mr. Robinson's current role?
18 A. Yes.
19 Q. If you look at the second page under
20 education and experience, it states that a vice
21 president should have responsibility to deliver at
22 least a hundred million annually. Do you see that
23 statement?
24 A. Uh-huh, yes.
25 Q. Is that still a requirement of the

Page 121

1 position?
2 A. Not to my knowledge.
3 Q. Is he required to deliver more or less
4 than that in sales?
5 A. Less.
6 Q. How much less?
7 A. About half. Can I qualify it at this
8 point?
9 Q. Certainly.
10 A. We have a hundred million dollar annual
11 goal, which is stated in our three year plan. So
12 that's probably why it's in this is because that
13 was always part of the three year design, was to
14 get to a hundred million dollars.
15 Q. And does that hundred million dollars
16 apply only to North America or to worldwide?
17 A. Worldwide.
18 Q. When did you first contact Mr. Robinson
19 about a possible position at Vision?
20 A. I don't remember an exact date. It was in
21 the late fall of 2004, late October/November
22 timeframe. At that time, the job description I had
23 was not for VP of Sales.
24 Q. What was your job description at that
25 time?

(210) 377-3027
7800 IH-10 WEST, SUITE 100
ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230
FAX(210) 344-6016
(800) 969-3027
31 (Pages 118 to 121)

1b9beaaf-d491-4bab-b861-3f68e96771a5

STEPHEN MASSEY     CONFIDENTIAL     October 3, 2005
ATTORNEY'S EYES ONLY

Page 146

1  Q. How did you make that offer?
2  A. In writing.
3  Q. Did you send Mr. Robinson a letter?
4  A. Yes. I didn't specifically but human
5  resources did.
6     MR. BERNDT: Again, I'd like to state
7  for the record that the offer of employment from
8  December 2004 has not been produced and we -- it's
9  clearly responsive and we need a copy of it.
10    MR. LANCILOTI: And I'll just respond
11 that I agree that if it exists it would be
12 responsive, but I don't -- I've asked Vision and I
13 know there was an offer that was made in March that
14 we produced, and I don't know that there was one
15 made in December that was in writing. So to the
16 extent it exists, I've asked for it, Vision has
17 looked to see if they have anything, they've given
18 me the ones that they have. But I'll ask again.
19 Q. (BY MR. BERNDT) Did you send -- so human
20 resources sent the letter to Mr. Robinson?
21 A. Yes.
22 Q. Did you review the letter before it went
23 out?
24 A. Only for the terms, yes.
25 Q. Did you have any conversations with

Page 147

1  Mr. Robinson regarding the offer of employment in
2  December?
3  A. Yes.
4  Q. How many conversations?
5  A. Two that I could think of. One in which
6  we reviewed the offer and two in which he declined
7  the offer.
8  Q. What did you say to Mr. Robinson and what
9  did he say to you during the first conversation?
10 A. Don't remember exact details, but in
11 general, we covered the offer letter, the area of
12 responsibilities, reporting structure. Whatever
13 the offer letter had, that's what we discussed.
14 Q. What did you say to Mr. Robinson and what
15 did he say to you during the second conversation
16 with Mr. Robinson?
17 A. He informed me that he didn't think that
18 it was in his interest or his family's interest to
19 make a change at that time and that he regretted it
20 because he and I had talked for some time about
21 wanting to work with each other again but that he
22 thought it was best for him at that time to decline
23 the offer.
24 Q. Did he give any specific reasons as to why
25 he was declining the offer?

Page 148

1  A. No.
2  Q. How long was this conversation?
3  A. I don't remember.
4  Q. What did Mr. Robinson say about his
5  concerns regarding his family?
6  A. Nothing other than the fact he didn't
7  think that the decision to take the offer was right
8  for him or his family at that time.
9  Q. And did he explain why that was?
10 A. No.
11 Q. Did you ask him why he didn't think it was
12 the right time to take the offer from Vision?
13 A. No. That was personal.
14 Q. And your testimony is you didn't talk
15 about anything else during that conversation?
16 A. Not to my recollection.
17    MR. BERNDT: I'd like to mark as
18 Exhibit 6 a document Bates stamped Vision 61.
19    (Exhibit No. 6 marked)
20 Q. (BY MR. BERNDT) All right. Do you
21 recognize Exhibit 6?
22 A. Yes.
23 Q. What is it?
24 A. It's an e-mail that I sent to Nicolaas
25 Vlok, Alan Arnold, Tim Keithahn and David Wegman in

Page 149

1  regards to Eric's declining the offer.
2  Q. And what date did you send the e-mail?
3  A. December 23rd.
4  Q. What time?
5  A. 6:39 a.m.
6  Q. All right. Can you read the first two
7  paragraphs of the e-mail into the record?
8  A. "Well, I'm afraid our fears have been
9  substantiated. Eric has decided not to join Vision
10 at this time. I spent two hours on the phone with
11 him last night and he is extremely disappointed
12 that he could not take advantage of this
13 opportunity but he feels the timing for him
14 personally is not right. He has some financial
15 requirements that could not survive a six- to
16 nine-month layoff from work. Granted that is a
17 worst-case scenario, but he doesn't feel he is a
18 position to take the risk at this time.
19    He left the door open though, he is
20 unhappy where he is and he doesn't see himself
21 staying there long term. He just truly fears his
22 non-compete agreement with Lakeview. Who knows, I
23 may talk him into it by the end of the holidays."
24 Q. Okay.
25    MR. LANCILOTI: Just to clarify for

(210) 377-3027
7800 IH-10 WEST, SUITE 100
38 (Pages 146 to 149)

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX (210) 344-6016
(800) 969-3027

1b9beaaf-d491-4bab-b861-3f58e96771a5

From: Stephen Massey
Sent: Thursday, December 23, 2004 6:39 AM
To: Nicolaas Vlok; Alan Arnold; Tim Keithahn; David Wegman
Subject: Eric Robinson

Well, I'm afraid our fears have been substantiated. Eric has decided not to join Vision at this time. I spend two hours on the phone with him last night and he is extremely disappointed that he could not take advantage of this opportunity, but he feels the timing for him personally is not right. He has some financial requirements that could not survive a 6 to 9 months layoff from working. Granted, that is a worse case scenario, but he doesn't feel he is in a position to take the risk at this time.

He left the door open, though. He is unhappy where he is and he doesn't see himself staying there long term. He just truly fears his non-compete agreement with Lakeview. Who knows, I may talk him into it by the end of the holidays.

That said, I am on a new exercise to find an adequate candidate. I'll keep you informed on my progress. Any suggestions would be greatly appreciated.

Best Wishes for a Happy Holiday Season,

Steve...

h830-981-5428
e210-865-6133

Disclaimer - 9/19/2005
The contents of this e-mail (and any attachments) are confidential, may be privileged, and may contain copyright material of Vision Solutions, Inc. or third parties. You may only reproduce or distribute the material if you are expressly authorized by Vision Solutions to do so. If you are not the intended recipient, any use, disclosure or copying of this e-mail (and any attachments) is unauthorized. If you have received this e-mail in error, please immediately delete it and any copies of it from your system and notify us via e-mail at helpdesk@visionsolutions.com.



EXHIBIT 6

REDACTED

CONFIDENTIAL
ATTORNEYS' EYES ONLY

VISION 000061

/26/2005