# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| Lakeview Technology, Inc., | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 05 C 7209 |
| Vision Solutions, Inc., Stephen Massey, and Allan Campbell, | ) ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Lakeview Technology, Inc. ("Lakeview") brings eight counts against defendants Vision Solutions, Inc. ("Vision"), Stephen Massey ("Massey"), and Allan Campbell ("Campbell"), relating to an alleged campaign on the part of Defendant Vision to induce Plaintiff's employees to breach their employment contracts and misappropriate Plaintiff's protected information. Plaintiff's claims are as follows: Count I, tortious interference with contract against Vision and Massey; Count II, breach of contract against Campbell; Count III, tortious interference with contract against Vision and Massey; Count IV, misappropriation of trade secrets against Vision and Massey; Count V, conversion against Vision and Massey; Count VI, aiding and abetting and/or inducing a breach of fiduciary duty against Vision and Massey; Count VII, violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, against Vision and Massey; Count VIII, civil conspiracy against Vision, Massey, and Campbell.

1

Before us is Massey's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and Campbell's motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2) for lack of personal and subject matter jurisdiction. Alternatively, Campbell moves to dismiss Count II under Rule 12(b)(6) for failure to state a claim, and for a more definite statement of Count VIII under Rule 12(e). For the reasons set forth below, we grant both defendants' motions to dismiss for lack of personal jurisdiction. Campbell's remaining motions are denied as moot.

## BACKGROUND

Plaintiff Lakeview is a Delaware corporation with its principal place of business in Oakbrook Terrace, Illinois. (Compl. ¶ 5.) Lakeview develops and supports "information availability software," technology which provides continuous access to information during scheduled system maintenance or when a computing system unexpectedly shuts down. (*Id.* at ¶ 6.) Because the software must "interact seamlessly with various hardware and software components," Lakeview relies heavily on partnerships with hardware and software providers. (*Id.* at ¶ 15.) Through those partnerships, Lakeview receives "invaluable technical information" that ensures that its products remain compatible with and compliment the latest generations of hardware and software components. (*Id.*) Additionally, these partnerships increase demand and broaden the channels of distribution for Lakeview's software, making them vital to its "worldwide sales network." (*Id.* at ¶ 16.) On average, Lakeview devotes 12 months to developing each partner or customer relationship, and spends in excess of $10 million annually doing so. As a result of this investment, Lakeview enjoys "notable partner and customer loyalty. (*Id.* at ¶ 17.) Lakeview's relationship with its partners relies heavily on its ability to maintain the confidentiality of the information that it

receives, particularly as it relates to its partners' prospective customers. (*Id.* at ¶ 18.)

Defendant Vision, a direct competitor of Lakeview, is a Delaware corporation with its principal place of business in Irvine, California. (Compl. ¶¶ 7-8.) All of Lakeview's claims center around Vision's alleged campaign to misappropriate Lakeview's trade secrets and confidential information. (*Id.* at ¶ 2.) Over the past few years, Vision has repeatedly hired Lakeview's sales executives, who then assume the same position and sales territories that they formerly managed at Lakeview. (*Id.*) By hiring these employees, Vision has – according to Lakeview – taken its confidential information and trade secrets and attempted to use them to gain a competitive advantage. (*Id.*) Additionally, Lakeview alleges that some of these former employees provided Vision with Lakeview's marketing materials, allowing it to copy those materials and misappropriate Lakeview's marketing strategies. (*Id.* at ¶¶ 57-59.)

Defendants Massey and Campbell are two of the former Lakeview employees that Vision has hired. Massey, a resident and citizen of Texas, is a former senior sales executive for Lakeview, but left to serve as Vision's Vice President of Worldwide Sales. (Compl. at ¶¶ 9-10, 56.) Campbell, a resident and citizen of Australia, is a former Lakeview consultant responsible for marketing and selling Lakeview's products in the Asia Pacific region, and currently serves as Vision's Vice President for Sales in the Asia/Pacific region. (*Id.* at ¶¶ 11-12.)

Lakeview retained Campbell, under a consulting agreement, to market and sell its products and services in the in the Asia Pacific region. (Compl. ¶ 4.) Pursuant to that agreement, Lakeview entrusted Campbell with access to confidential information regarding its products, marketing strategies, business partners, and customers. (*Id.*) It included restrictive covenants that prohibited Campbell from "perform[ing] services . . . for any competitor of Lakeview," and from retaining or

3

using Lakeview's confidential information. By joining Vision, Lakeview alleges, Campbell has breached those covenants. (*Id.*) Further, Lakeview claims that Vision and Massey had knowledge of the Consulting Agreement, and tortiously interfered with it by inducing Campbell to so breach his obligations. (*Id.* at ¶¶ 72-74.)

Lakeview also alleges that – after joining Vision – Massey induced both Campbell and Eric Robinson ("Robinson"), its former Vice President of Sales and Marketing, to breach their contracts with Lakeview, and to misappropriate Lakeview's confidential information and trade secrets. (*Id.* at ¶¶ 2, 19.)[1] In his position at Lakeview, Robinson was responsible for knowing, amassing, and safeguarding detailed, sensitive information about Lakeview, its products and pricing, the industry, and its network of customers and business partners. (Compl. ¶¶ 3, 19-28.) Robinson had an employment agreement with Lakeview, under which he agreed that, for one year after his employment with Lakeview ended, he would not "participate in or be engaged directly or indirectly anywhere in the world where [he] actively participated to generate business for Lakeview . . . in any Competitive Business, whether as owner, partner[], director, shareholder, consultant, agent, employee, co-venturer, or otherwise." (*Id.*) Additionally, Robinson agreed that he would not, for one year following his employment with Lakeview, "solicit or accept on behalf of another or attempt to entice away from Lakeview (i) any customer of Lakeview . . . or (ii) any prospective customer of Lakeview." (*Id.*)

Robinson announced his resignation in May 2005, assuring Lakeview that he was retiring

---

[1]Though many of Lakeview's claims relate to Robinson's departure, he is not a party to this action. However, Lakeview has a separate action pending against Robinson for breach of contract and misappropriation of trade secrets, *Lakeview Technology, Inc. v. Eric Robinson*, No. 05 C 3227 (N.D. Ill, filed 05/31/2005) (Kocoras, J., presiding).

4

from the software industry altogether. (Compl. ¶ 3.) When rumors surfaced that he was going to join Vision, he "specifically and adamantly" denied them when confronted by Lakeview. (*Id.* at ¶ 36.) However, Robinson immediately began working for Vision after leaving Lakeview. (*Id.* at ¶ 3.) Lakeview alleges that this deceit was part of an agreement between Robinson, Vision, and Massey to conceal Robinson's employment at Vision, so that he could continue to work at Lakeview in the interim and gain access to valuable information. (*Id.* at ¶¶ 38-40.) Specifically, Lakeview alleges that Vision knew and approved of Robinson's alleged lies, and that Massey instructed Vision's human resources department not to publicly or internally (within Vision) announce Robinson's hiring. (*Id.* at ¶ 38-41.) As a result, Lakeview allowed Robinson to continue working, attend annual sales meetings, and access its sales and marketing plans for the coming year. (*Id.* at ¶¶ 46-48.) During that time period, Robinson accessed dozens of Lakeview reports maintained on confidential sales databases (*Id.* at ¶ 49.)

## STANDARD OF REVIEW

In a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), plaintiff bears the burden of showing a prima facie case of personal jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). *See also RAR, Inc. v. Turner Diesel, Ltd.*, 101 F.3d 1272, 1276 (7th Cir.1997). In determining whether we have personal jurisdiction over the defendant, we may receive and consider affidavits and other materials submitted by the parties. *See Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir.1987), *superceded by statute on other grounds as stated in FMC Corp. v. Varonos*, 892 F.2d 1308, 1310 (7th Cir.1990). For purposes of a motion to dismiss based on personal jurisdiction, we "accept all allegations of the complaint as true except those controverted by defendants' affidavits." *Northwestern Corp. v. Gabriel Mfg. Co.*, No.

5

96 C 2004, 1996 WL 73622, at *2 (N.D. Ill. Feb. 6, 1996). Where the defendant submits an affidavit contesting personal jurisdiction, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the existence of jurisdiction." *Purdue*, 338 F.3d at 783. We resolve all factual disputes in the record in plaintiff's favor, but we may accept as true those facts presented in defendant's affidavit that remain uncontested. *Id.*; *RAR*, 107 F.3d at 1275.

**DISCUSSION**

**I.     Defendant Massey's Motion to Dismiss**

Massey moves to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. It is undisputed that Massey is resident of Texas. (*See* Massey Mot. to Dismiss Ex. A, Declaration of Stephen Massey, at ¶ 1.) A federal court can acquire personal jurisdiction over a non-resident defendant by asserting either general or specific jurisdiction. We find that Lakeview has failed to provide a sufficient basis for asserting either form of personal jurisdiction over Massey.

**A.     General Jurisdiction**

First, general jurisdiction is proper if the defendant has regular, continuous, and systematic contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984). Here, Massey submits that he has visited Illinois no more than six times "for personal reasons." (*Id.* at ¶ 8.) Though he admits that he visited Illinois on business "occasionally" and "frequently contacted Lakeview employees" while employed by Lakeview, he has had no contact with Lakeview personnel regarding that employment since late 2003. (*Id.* at ¶ 10.) While employed by Vision, Massey "temporarily oversaw" the work of a regional sales manager who resides in Illinois, contacting him by telephone and e-mail on a weekly basis, which was required pursuant to his employment. (*Id.* at ¶ 15.) Moreover, Massey submits that he has never owned real

6

estate, paid income or property taxes, held bank accounts, voted, or maintained a personal office or telephone number in the state of Illinois. (*Id.* at ¶¶ 2-7.) Finally, Massey asserts that "no communications that [he] had with Robinson or Campbell in connection with their possible employment with Vision and/or once they began working for Vision occurred in or in any way involved Illinois . . . to the best of [his] knowledge." (*Id.* at ¶ 19.)

In short, the only long-term, ongoing contact that Massey appears to have had with Illinois involves contacting friends by telephone and e-mail a few times a year and changing planes at O'Hare International Airport. (*See id.* at ¶¶ 8-9, 14.) Lakeview does not contest this account of the facts. Thus, we find that Massey lacks the "regular, continuous, and systematic contacts" with Illinois required for us to find general jurisdiction.

### B. Specific Jurisdiction

Second, in the absence of general jurisdiction, a court can acquire specific jurisdiction over a non-resident defendant when the claim arises from or is related to the defendant's contacts with the forum. *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945). To establish a *prima facie* case for specific personal jurisdiction, a plaintiff must show: 1) that the defendant is amenable to process; and 2) that the assertion of jurisdiction does not violate due process requirements. *See, e.g.*, *Watchworks, Inc. v. Total Time, Inc.*, 2002 WL 424631 (N.D. Ill. 2002).

Under Federal Rule of Civil Procedure 4(k), a defendant is amenable to service when authorized by statute or when the defendant is subject to the forum state's long arm statute. Here, there is no statute providing for national service of process, so we look to the Illinois law to determine if Massey is amenable to process. *LFG, LLC v. Zapata Corp.*, 78 F. Supp. 2d 731, 734 (N.D. Ill. 1999). Because Illinois authorizes personal jurisdiction to the maximum extent allowed

by the Illinois and federal constitutions, this inquiry collapses into a due process inquiry. *See, e.g.*, *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 833 (N.D. Ill. 2000); *see also* 735 ILCS 5/2-209(c). But, as the Supreme Court of Illinois has observed, "[t]he Illinois Constitution contains its own guarantee of due process to all persons, a guarantee which stands separate and independent from the Federal guarantee of due process." *Rollins v. Ellwood*, 565 N.E. 2d 1302, 1316 (1990) (citing (Ill. Const. art. I, § 2).

Specifically, under Illinois' "fiduciary shield" doctrine, personal jurisdiction does not typically extend to an "employee of a corporation who acts in a representative capacity, unless his conduct was performed 'for his personal benefit.' " *Kohler Co. v. Kohler Intern., Ltd.*, 196 F. Supp. 2d 690, 699 (N.D. Ill. 2002) (citing *Rollins*, 565 N.E. 2d at 1316-17). *See also Rollins*, 565 N.E. 2d at 1318 ("[W]e find it to be unfair and unreasonable, under Illinois' due process clause and the tenets of our concept of the jurisdictional power of the Illinois courts, to assert personal jurisdiction over an individual who seeks the protection and benefits of Illinois law, not to serve his personal interests, but to serve those of his employer or principal."). Here, assuming *arguendo* that Massey's conduct provides the requisite contacts to satisfy federal due process, we find the "fiduciary shield" doctrine to nonetheless preclude the exercise of personal jurisdiction over him.

The "fiduciary shield" is an equitable, discretionary doctrine which "protects a non-resident from being haled into court in Illinois in his individual capacity when that person's only contact with Illinois is 'by virtue of his acts as a fiduciary of a corporation.' " *Plastic Film Corp. of America, Inc. v. Unipac, Inc.*, 128 F. Supp. 2d 1143, 1147 (N.D. Ill. 2001) (citing *Alpert v. Bertsch*, 601 N.E. 2d 1031, 1037 (1992)). We observe that all of the claims that Lakeview brings against Massey arise from conduct which allegedly occurred while Massey was a Vision employee, for the benefit of

Vision.² Counts I and III, tortious interference with contract as to Robinson and Campbell, respectively, arise from Massey's alleged "recruitment" efforts aimed at bringing them to Vision. The other six counts against Massey, ranging from misappropriation of trade secrets to conspiracy, essentially claim that Massey acted in concert with Robinson and/or the other defendants in bringing valuable talent and information to Vision. As such, it is clear that Massey's relevant contact with Illinois was "by virtue of his acts as a fiduciary of a corporation." *Id.*

Indeed, Lakeview does not dispute that Massey's actions were for the benefit of Vision, but rather argues that the doctrine does not apply to high-ranking company officers who have either a direct financial stake in a company's health or discretion over their contacts with the forum state. (*See* Pl. Resp. p.11; Pl. Supp. Resp. pp.4-5.) Lakeview argues that the doctrine is therefore inapplicable to Massey, pointing to his "very senior position at Vision" and his admission that he received sales-driven bonuses as evidence that he had a "direct financial stake" in Vision's health. Pl. Resp. p.11; Pl. Supp. Resp. p.5.)

It is true that courts in this district have found the fiduciary shield inapplicable to "an individual who is a high-ranking company officer or shareholder [who] has a direct financial stake in the company's health." *Kohler*, 196 F. Supp. 2d at 699 (collecting cases). However, "[t]he determinative factor is the individual's status as a shareholder, not merely as an officer or director."

---

²Though Massey was at one point an employee of Lakeview, that employment ended in 2003, and none of the claims here relate to that employment. Rather, these claims concern Massey's alleged actions *after* joining Vision.

9

*Plastic Film*, 128 F. Supp. 2d at 1147.[3] Here, Massey's declaration that he has "never owned shares of Vision stock" is uncontested. (*See* Massey Mot. to Dismiss Ex. A, Declaration of Stephen Massey, at ¶ 18.) Accordingly, we find the "fiduciary shield" to bar the exercise of jurisdiction over Massey.

## II. Defendant Campbell's Motion to Dismiss

Lakeview brings two counts against Campbell: Count II, breach of contract, and Count VIII, civil conspiracy. Campbell moves to dismiss both counts under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2) for lack of personal and subject matter jurisdiction. Alternatively, he moves to dismiss Count II under Rule 12(b)(6) for failure to state a claim, and for a more definite statement of Count VIII under Rule 12(e). Because we find that Lakeview has failed to provide a sufficient basis for asserting personal jurisdiction over Campbell, we deny his remaining motions as moot.

It is uncontested that Campbell is a resident and citizen of Australia. (*See* Campbell Mot. to Dismiss Ex. A, Declaration of Allan Campbell, at ¶ 18.)[4] Moreover, it is clear from Campbell's declaration that his connections to Illinois are even more tenuous than Massey's. (*See id.*) Thus, for the reasons set forth in our disposition of Massey's motion, we proceed directly to the question of whether we can assert specific jurisdiction over Campbell.

As noted above, Illinois authorizes personal jurisdiction to the maximum extent allowed by

---

[3]*See also Consumer Benefit Services, Inc. v. Encore Marketing International, Inc.*, No. 01 C 6985, 2002 WL 31427021, at *3 (N.D. Ill. 2002) ("In determining the applicability of the fiduciary shield doctrine to corporate officers and directors, courts often look at these two exceptions conjunctively rather than exclusively. Specifically, they focus on whether a defendant who is in a high-ranking position and has decision making authority also has a personal financial interest.") (Not Reported in F. Supp. 2d).

[4]In addition to the declaration attached to his motion to dismiss, Campbell filed a supplemental declaration with his Reply Memorandum. (Dkt. 46.)

the Illinois and federal constitutions, and so our analysis essentially collapses into a due process inquiry. *See, e.g.*, *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 833 (N.D. Ill. 2000); 735 ILES 5/2-209(c). First, we must determine whether Campbell "has 'purposefully established minimum contacts within the forum State' and consider whether, by traditional standards, those contacts would make personal jurisdiction reasonable and fair under the circumstances." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985)). Second, even if minimum contacts are shown, we still "must examine other factors, such as the forum's interest in adjudicating the dispute and the burden on the defendant of appearing in the forum, in order to determine whether the exercise of personal jurisdiction satisfies traditional notions of fair play and substantial justice." *International Medical Group, Inc. v. American Arbitration Ass'n, Inc.*, 312 F.3d 833, 846 (7th Cir. 2002) (citing *Burger King*, 471 U.S. at 476-77; *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 939 (7th Cir.2000), *cert. denied*, 532 U.S. 943 (2001)).

### A. Lakeview's Breach of Contract Claim Against Campbell

First, Lakeview argues that we have specific jurisdiction over its breach of contract claim against Campbell. Though a contractual relationship can sometimes establish specific jurisdiction, "an out-of-state party's contract with an in-state party is alone not enough to establish the requisite minimum contacts." *RAR*, 107 F.3d at 1277 (citing *Burger King*, 471 U.S. at 478). "Rather, prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing must indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant." *Id.* (quoting *Burger King*, 471 U.S. at 479) (internal

11

quotations omitted).

In determining whether the contractual relationship between Campbell and Lakeview is sufficient to establish personal jurisdiction, we consider a number of factors: 1) who initiated the transaction; 2) where the contract was entered into; (3) where the performance of the contract was to take place; and 4) where the contract was negotiated. *See BAB Systems, Inc. v. UNK, Inc.*, No. 02 C 8797, 2002 WL 31867705, at * 2 (N.D. Ill. Dec. 20, 2002) (not reported in F. Supp. 2d) (citing *Viktron Ltd. Partnership v. Program Data, Inc.*, 759 N.E. 2d 186, 193-94 (Ill. App. 2d Dist. 2001)). Additionally, we consider the parties' choice of law provision. *See Sungard Data Systems, Inc. v. Central Parking Corp.*, 214 F. Supp. 2d at 881, 879 (N.D. Ill. 2002). However, none of these factors alone is dispositive.

Here, the parties first made contact when Campbell responded to a "blind" internet employment advertisement. (*See* Campbell Mot. to Dismiss Ex. A, Declaration of Allan Campbell, at ¶ 12.) Lakeview sent two employees – including Massey, who was still working at Lakeview during this time period – to Australia to interview Campbell. (*Id.* at ¶ 13.) All of the ensuing negotiations were conducted over the phone, sometimes while Campbell was in Australia, and sometimes while he was traveling elsewhere, but never in Illinois. (*Id.* at ¶ 14.) It is undisputed that, following these negotiations, Campbell signed the Consulting Agreement in Brisbane, Australia, and that a Lakeview officer finalized the agreement by signing it in Illinois. (*Id.* at ¶ 15; Pl. Resp. p.7-8.) Campbell performed his duties under the agreement by selling Lakeview's software to its "channel partners" in the South Asia and Pacific region. (*Id.* at ¶ 16.) Indeed, Campbell's only physical presence in Illinois pursuant to the contract involved four visits to Lakeview's offices for an orientation, two sales meetings, and a company party. (*Id.* at ¶ 17.) All

other contact was by telephone, mail, or e-mail. (*Id.*; Pl. Resp. p.6-7.)

First, Lakeview argues that Campbell initiated the relationship between them by responding to an advertisement. (Pl. Resp. p.7.) While Campbell concedes that he responded to an advertisement (see Campbell Mot. to Dismiss Ex. A, Declaration of Allan Campbell, at ¶ 12), necessarily Lakeview first placed the advertisement where it could apparently be accessed worldwide. Moreover, Lakeview actually sent two employees to Australia just to interview Campbell; this was before any negotiations had taken place. (*See id.* ¶¶ 13-14.) As such, we observe that the record suggests that Lakeview took the more substantial role in "initiating" the parties' relationship, though we acknowledge that Campbell did make the first communication specific to the parties. Accordingly, we do not place great weight on this factor. *Cf. Westfalia-Surge, Inc. v. Dairy Tex Inc.*, No. 03 C 4304, 2003 WL 22938899, at *2 (N.D. Ill. Dec. 10, 2003) (giving disputed factor "minimal weight" in jurisdictional analysis) (Not Reported in F. Supp. 2d).

Second, Lakeview argues that the contract was executed in Illinois, because that is where the last act necessary to give it validity was performed. (Pl. Resp. pp.7-8.) However, we do not consider the plaintiff's "acts of drafting and signing [a] contract in Illinois" here, because "the unilateral acts of the plaintiff in the forum state do not establish the necessary minimum contacts required for specific jurisdiction." *Sungard*, 214 F. Supp. 2d at 881 (citing *Burger King*, 471 U.S. at 475).

Third, Lakeview stresses Campbell's "frequent and extensive" contact with management in Illinois, which was required in order for him to learn about its products, and allowed Lakeview to monitor his performance and progress. (Pl. Resp. p.8.) However, Lakeview cites no authority for its proposition that this sort of communication rendered Campbell's performance "in Illinois." (*See*

13

*id.*) In any event, this sort of contact is insufficient to render Campbell's tenuous connection to Illinois sufficient for the assertion of personal jurisdiction. *Cf. Sungard*, 214 F. Supp. 2d at 881 ("[S]imply 'making telephone calls and mailing payments into the forum state are insufficient bases for jurisdiction.' ") (quoting *Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co.*, 18 F.3d 389, 395 (7th Cir.1994)).

Finally, Lakeview points to the choice-of-law provision in the Consulting Agreement as establishing that Campbell availed himself of Illinois law. Though a choice-of-law provision is certainly relevant in "considering whether a defendant has 'purposefully invoked the benefits and protections of a State's laws' . . . such a provision standing alone [is] insufficient to confer jurisdiction." *Burger King*, 471 U.S. at 482 (holding that choice of law provision, though alone insufficient, was significant contact in light of 20-year interdependent franchise relationship). *See also Sungard*, 214 F. Supp. 2d at 882 ("The choice of law provision is also only one factor to consider in the minimum contacts analysis, and standing alone, it is insufficient to confer personal jurisdiction."). Thus, the inclusion of the choice-of-law provision here certainly weighs in favor of conferring jurisdiction, but it is hardly conclusive, and is but one factor to consider along with all of the others.

In sum, it is unclear whether Campbell or Lakeview is properly considered to have "initiated" the relationship between them, and only the unilateral acts of Lakeview occurred in Illinois during the execution of the contract. On the other hand, the consulting agreement was certainly negotiated and performed outside of Illinois, save for Campbell's regularly contacting Illinois offices by phone, mail, and e-mail. Thus, those factors – taken as a whole – weigh against asserting jurisdiction over Campbell. Although the inclusion of a choice of law provision weighs

towards a finding of sufficient contacts with Illinois, we find that, on balance, and considering that Campbell is an alien defendant not even residing in the same hemisphere as Illinois, Lakeview has failed to establish a sufficient basis for asserting specific jurisdiction over Campbell in regards to its breach of contract claim against him. *See, e.g.*, *Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1362 (7th Cir. 1996) ("[T]he burden imposed on a foreign defendant who is forced not only to travel a great distance but also to litigate in a foreign nation's judicial system is quite great and should be given significant weight in the reasonableness determination.") (citing *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 114 (1987)).

### B. Lakeview's Conspiracy Claim Against Campbell

Second, Lakeview argues that we have specific jurisdiction over its civil conspiracy claim against Campbell. Under Illinois law, a conspiracy claim allows for personal jurisdiction against non-resident defendants who did not themselves commit a tort in Illinois, but conspired with others to do so. *See Hollinger Intern., Inc. v. Hollinger Inc.*, No. 04 C 0698, 2005 WL 589000, at *14 (N.D. Ill. 2005) (citing *Cleary v. Phillip Morris Inc.*, 726 N.E.2d 770, 773 (Ill. App. 1st Dist. 2000) (Not Reported in F. Supp 2d.). First, the Seventh Circuit has observed that, though not subject to heightened pleading per se, a conspiracy claim "differs from other claims in having a degree of vagueness that makes a bare claim of 'conspiracy' wholly uninformative to the defendant." *Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006). Accordingly, "courts require the plaintiff to allege the parties, the general purpose, and the approximate date of the conspiracy." *Id.*

Even if Lakeview has met that standard, it nonetheless fails to meet the standard required to

15

make the *prima facie* factual showing of a conspiracy required in a 12(b)(2) motion.[5] When a defendant challenges jurisdiction, "[a]llegations of participation in a conspiracy may satisfy the minimum contacts test," *Flag Co. v. Maynard*, 376 F. Supp. 2d 849, 854 (N.D. Ill. 2005), but it is not enough that a plaintiff "simply allege" the existence of a conspiracy. *See Plastic Film*, 128 F. Supp. 2d at 1146. Rather, the party asserting jurisdiction must: "1) make a *prima facie* factual showing of conspiracy (i.e., point to evidence showing the existence of a conspiracy and the defendant's knowing participation in that conspiracy ); 2) allege specific facts warranting the inference that the defendant was a member of the conspiracy; and 3) show that the defendant's co-conspirator committed a tortious act pursuant to the conspiracy in the forum." *Id.* Lakeview has failed to meet this burden.

Lakeview argues that "[t]he circumstances and timing of Campbell's departure for Vision – only two weeks before Robinson joined Vision – indicates that Campbell's hiring was part of the same pattern of Vision misconduct that forms the basis for all of the claims in this litigation." (Pl. Resp. p.9.) Assuming *arguendo* that this is a valid inference, at most it shows that Campbell's hiring was part of an overarching pattern of Vision's misconduct. This tells us nothing about Campbell's role in Vision's alleged conspiracy, let alone anything regarding his "knowing participation" in it.[6]

---

[5] In its Response Memorandum, Lakeview appears to have conflated the requirements for alleging a conspiracy under federal notice pleading with the requirements for asserting a conspiracy in support of personal jurisdiction. (*See* Pl. Resp. p.9.) Specifically, Lakeview asserts that under a conspiracy theory of jurisdiction, "the plaintiff must sufficiently *allege* that: (1) the non-resident defendant was part of an actionable conspiracy; and (2) a co-conspirator performed a substantial act in furtherance of the conspiracy in Illinois." (Pl. Resp. p.9 (emphasis added)).

[6] After deposing Campbell, Lakeview filed a Supplemental Response (Dkt. 61.) There, it notes that Campbell's deposition indicates that he "was already finalizing his negotiations with Vision" at the time that he resigned from Lakeview in May 2005 – despite telling it that he was

Accordingly, we find that Lakeview has failed to assert a proper basis for jurisdiction over Campbell regarding its conspiracy claim.

## CONCLUSION

For the reasons set forth above, we grant the motions of defendants Stephen Massey and Allan Campbell to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Campbell's additional motions are denied as moot. It is so ordered.

*[signature: Marvin E. Aspen]*

Honorable Marvin E. Aspen
U.S. District Court Judge

Dated: 1/9/07

---

merely "considering his options" – and was thus able to receive confidential Lakeview information after he had already agreed to join Vision. (Supp. Resp. pp.4-5.) However, Lakeview does not specifically state why this tends to suggest that Campbell knowingly participated in a broader conspiracy with the other defendants, nor can we see why it would.